MATTER OF R——

## In DEPORTATION Proceedings

### A-7488062

*Decided by Board May 20, 1960*

**Mental defect—Temporary illness due to wartime experiences.**

Service has not sustained burden of proving that alien was afflicted with mental defect (schizophrenia) at time of entry when evidence reasonably supports conclusion that he suffered from temporary illness akin to neurosis brought on by wartime experiences.

CHARGE:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry—Mental defective (section 3, Act of February 5, 1917).

## BEFORE THE BOARD

**Discussion:** This case is before us on appeal from the decision of the special inquiry officer finding respondent deportable on the charge stated in the order to show cause. The special inquiry officer granted respondent voluntary departure with an automatic order of deportation in the event he fails to depart. Respondent is 29 years old, a native and formerly a citizen of Poland. His only entry into the United States was at Boston, Massachusetts, on May 26, 1950, when he was admitted as an immigrant. The special inquiry officer states that the sole issue as to deportability is whether respondent was suffering from a mental defect within the meaning of section 3 of the Immigration Act of February 5, 1917, as amended, at the time of his entry.

Respondent was born in Poland in 1931 but attended school only 2 years. Following the invasion of Poland by the German Nazis, his father was killed. According to his testimony, respondent and his mother hid in the forest, perhaps for 2 years. They were eventually apprehended, and respondent's mother was sent to Auschwitz concentration camp. Respondent denied that he was Jewish and was placed in a labor camp by the Nazis. He states that he worked in an underground factory making airplane parts, that he worked from early in the morning until night with practically no food and very harsh treatment. Others in the camp, discovering

646

that he was Jewish, teased him by threatening to expose him, although they never did so. After his liberation by the Allied forces he was hospitalized for malnutrition, and eventually he was sent to an orphanage in Italy, where he was discovered by his mother at the end of 1947.

In 1948 respondent complained of not feeling well and, showing evidence of emotional distress, he was taken by his mother to the Clinic for Nervous and Mental Diseases at the University of Rome, where he was admitted on June 23, 1948. The record contains a short psychiatric report, in Italian and English, with reference to his hospitalization there. The only diagnosis in this record is, "Diagnosis, on first admission, schizophrenic syndrome." Based on information furnished by respondent's mother, the director of the clinic states, "As Polish Jew, the patient must have been submitted to trying times, living away from mother, hiding in forests and then in a concentration camp * * * Status: Patient in bed, in bad temper, lucid and well oriented; states that everything is exaggeration on the part of mother and not true. Occasionally shows difficulties in speech." He was given 10 electroshock treatments and was "dismissed in improved condition" on August 19, 1948.

The record does not show how respondent occupied himself from the time he was discharged from the hospital in Rome until he came to the United States in May 1950. He went to Cincinnati, lived by himself, and was employed until September 1950. The record shows that he consulted Dr. S——B—— in that city in August 1950. Apparently, respondent consulted Dr. B—— only once.

Respondent went to Newark, New Jersey, to join his mother in September 1950, entered the Newark Central High School and attended briefly. Early in 1951 respondent consulted a doctor at the Jewish hospital who suggested that, *while he did not have to go into a hospital*, by doing so he could get treatment more quickly, get it over with, and continue his studies. He went into Brooklyn State Hospital on March 28, 1951, had insulin therapy, and was approved for discharge on June 19, 1951. The diagnosis at that institution was "dementia praecox—catatonic type." The final conference conclusions are that the patient "is now free of delusions and hallucinations."

The record contains two certifications from the United States Public Health Service. The first, dated August 1, 1956, certifies that, based on the I-234 (Certificate as to Alien Becoming a Public Charge), and the clinical summary from the Brooklyn State Hospital, in the opinion of two Public Health doctors the alien was certifiable for "a Class A mental defect, schizoid personality, at the time of entry into the United States on May 26, 1950," and, "It is also our opinion that the alien became a public charge as the result

of an affliction with a Class A mental defect, dementia praecox, catatonic type, not affirmatively shown to have arisen subsequent to entry on the date stated." At the request of the Immigration and Naturalization Service, the Public Health doctors reevaluated the record, including the findings of Drs. B—— and R——, the report from the University of Rome, and the transcript of the testimony in this case. On October 19, 1959, they altered their certification to state that it was their opinion that respondent was "certifiable for a Class A condition, mental defect, schizophrenia, at the time of entry into the United States on May 26, 1950." There is no "became a public charge" ground in this case. At no time did the United States Public Health Service doctors examine or interview respondent personally.

Since respondent was discharged from the hospital in June 1951, he has been almost continuously employed at $40 to $65 a week, primarily doing office work, and, in addition, has been almost continuously going to school. He graduated from high school in 1955 and received a B. A. degree from the Yeshiva University of Brooklyn in 1951. He has also been granted a degree of Bachelor of Religious Education and a teacher's certificate. He is now teaching at the Yeshiva University, in addition to continuing his graduate studies. He has received scholarships from Jewish organizations, but otherwise has been self-supporting. The record contains letters and reports from several of respondent's professors, one of whom teaches psychology at Columbia, as well as at Yeshiva University. They testify to respondent's excellence as a student, his maturity, popularity with his classmates, acquired competence in the English language, his stability and high standards of ethics. The record also contains recommendations from former employers regarding his integrity, honesty, ability, and popularity.

The record contains two communications from Dr. B——, exhibits 5 and 14, stating that, on the basis of his interview with respondent and on the basis of follow-up material supplied since that time, it is the opinion of Dr. B—— that in 1950 respondent was suffering from anxiety hysteria, resulting from excessive psychological stress arising from the external environment with which respondent was attempting to cope. He likened the situation to "combat fatigue" in war time, stating that "normal healthy men when exposed to persistent stress of war for prolonged periods" will begin to show so-called "neurotic" symptoms of behavior. However, as respondent became more adjusted, familiar with the new language and culture, he demonstrated ability to function well in his social, academic, and marital life and is currently performing in college and otherwise with the "highest minority of normally functioning people."

Dr. H——R——, whose qualifications as a psychiatrist are con

648

ceded by the special inquiry officer, and who has testified previously in immigration matters, discussed the nature and treatment of schizophrenia. The special inquiry officer's decision deals with Dr. R——'s testimony at some length. Dr. R——, in a 7-page single-spaced statement accompanying this appeal, indicates that he feels strongly that the opinion of the special inquiry officer does not accurately reflect the substance of his testimony, nor his reasons for disagreeing with the diagnosis of the Brooklyn State Hospital and the certifications of the Public Health Service. He declares that schizophrenia is a basic personality condition which takes long and intensive treatment, that a small number of electroshocks and a short period of treatment will never result in improvement in a case of true schizophrenia. Respondent had less than one month of hospitalization in Rome, and two and a half months in Brooklyn. Dr. R—— testified that the same is true of insulin treatment, that discharge after less than 3 months of insulin treatment and hospitalization would not have been sufficient for improvement and discharge if respondent truly had dementia praecox, schizophrenia or schizoid personality, all of which mean the same thing. He states that the Italian dagnosis of "Schizophrenic syndrome" does not mean the same as schizophrenia, that "syndrome" means "symptoms." He testified that shock treatments, plus psychoanalysis, plus long hospitalization, plus a protected environment following discharge are all essential to remission of true schizophrenia. Respondent has had none of these prerequisites to cure. It is his opinion that both in Rome and in Brooklyn respondent was hospitalized because of the economic condition of the family, the fact that there was no family circle, no warm and comfortable home to care for respondent while he was being given out-patient treatment. To both Dr. B—— and Dr. R—— the most important evidence which negatives schizophrenia is that, since his discharge from Brooklyn State Hospital in 1951, respondent has successfully pursued a most strenuous life, attending school, working, teaching, and is now married.

The text material available to us substantiates the testimony of Dr. R—— and the depositions of that witness and Dr. B—— regarding the nature and treatment of schizophrenia generally. *Encyclopedia Britannica*, 1955 Edition, Vol. 20, under the heading "Schizophrenia," described the four major types and states that among other treatments are the insulin and electroshock treatments and, further, "In many cases, what seems most important is to provide the patient with an environment in which he is protected and in which he can work through his periods of confusion and away from the disturbing influences of his ordinary environment." Volume 18, the same reference work, under "Psychiatry" devotes

649

considerable discussion to "War Neuroses," describing the manifestations, causes and treatments presently available and, important to us, states, "A few latently psychotic soldiers develop a full-blown malignant psychosis such as schizophrenia. Others become temporarily psychotic, with pathological suspiciousness or loss of comprehension of present reality; recovery is rapid on removal to safety. Very few malignant and permanent psychoses develop. * * * Among the important causative factors for these neurotic reactions are *physical and emotional depletion and fatigue.*" (Emphasis supplied.)

*Legal Medicine*, edited by R. B. H. Gradwohl (Mosby Co., 1954), is *not* describing respondent when it states (p. 898), "The latent schizophrenic is an individual in a recession or a prolonged arrested phase. The latent schizophrenic has a bizarre, unsatisfied, isolated adjustment to life and may be inadequate to maintain his economic independence unless his position in life has *unusual protective features.* Schizophrenics suffer from eccentricities, from inability to understand the people about them, and from queer notions about the significance of social values and customs. As they feel isolated, they are hostile, suspicious, and insecure, finding their way into weak passivity or dangerous aggressiveness and poorly controlled hates."

*Fundamental Psychiatry*, Cavanagh and McGolderick (Bruce, 1954) (p. 328), declares that certain prognosis for the schizophrenias is impossible. Discussing the matter of treatment of patients who have suffered schizophrenic episodes, this work stresses that the schizophrenic will remain in his world of images and complexes so long as he finds them more pleasant than he does the world of reality, and that it must be realized that the process of recovery will be slow, and that psychotherapy is absolutely essential.

*Psychiatry and Law*, Guttmacher and Weihofen (Norton and Co., 1952) (pp. 72–80), stresses the "malignancy and chronicity" of this psychosis and states, "There is probably no problem in modern pathology, except that of cancer, on which there has been so much work with so little in the way of concrete results." Following a discussion of the symptoms, treatments, and theory, this work also mentions the war neuroses (p. 78): "A very interesting group of psychoses occurred during the war, most of them in combat soldiers. These were short-lived psychotic illnesses which cleared up abruptly after two or three weeks' hospitalization. Most of the symptoms were typical of schizophrenia." These authorities and others persuade us that respondent, who has sought, and been successful in a most strenuous and outgoing life, could not have suffered from true schizophrenia.

The legislative history of the 1952 act does not, in our opinion

indicate a congressional intention to exclude such a person as respondent, or congressional understanding that a person such as he would have been excluded in the past. The Public Health Service report on the medical aspects of H.R. 2379, House Report No. 1365, 82d Cong., 2d Sess. (February 14, 1952, pp. 47–48) states:

*Mental defect.*—The utilization of the term "mental defect" serves a very useful purpose and should be continued within the language of the bill. It should be pointed out that in using this expression, "mental defect," it has or bears no relationship to mental deficiency which is related to the intellectual status of the individual. * * * Such a term could also be used to cover the more severely disabling neuroses and conduct and habit disorders of adults and children. It can be used in classifying those persons who are likely to be brought into repeated conflict with social customs, authority, or society in general. * * *

House Report No. 1365 also states (pp. 46–47):

*Psychopathic personality*— * * * The conditions classified within the group of psychopathic personalities are, in effect, disorders of the personality. They are characterized by developmental defects or pathological trends in the personality structure manifest by lifelong patterns of action or behavior, rather than by mental or emotional symptoms. Individuals with such a disorder may manifest a disturbance of intrinsic personality patterns, exaggerated personality trends, or are persons ill primarily in terms of society and the prevailing culture. The latter or sociopathic reactions are frequently symptomatic of a severe underlying neurosis or psychosis and frequently include those groups of individuals suffering from addiction or sexual deviation. * * *

Senate Report No. 1515, 81st Congress, 2d Session (April 20, 1950), also indicates an intention to exclude aliens who are definitely mentally ill. There is no discussion of the term "mental defect," but with reference to the exclusion of persons with "constitutional psychopathic inferiority," this report says (p. 343) that the exclusion of persons within the meaning of that term was "aimed at keeping out of the country aliens with a propensity to mental aberration, those with an inherent likelihood of becoming mental cases, as indicated by their case history. * * * (p. 345) The present clauses excluding mentally and physically defective aliens, with three exceptions, are sufficiently broad to provide adequate protection to the population of the United States, without being unduly harsh or restrictive."

The Manual for Medical Examination of Aliens, United States Public Health Service, makes it clear that a person is not to be certified as afflicted with a "mental defect" unless he is seriously ill, or if his difficulty is only temporary. This instructive handbook provides, chapter 6, section A:

4. *Insanity.* * * * d. Not all persons who meet the aforementioned criteria are certifiable as insane, for section 34.7 of the regulations[1] (chapter 1) states "that a class A certificate or class A notification of a mental defect, disease,

---

[1] The reference is to 42 CFR 34.7, which embodies this directive.

or disability shall in no case be issued with respect to an alien having only mental shortcomings due to ignorance, or suffering only from a mental condition (i) *attributable to remedial physical causes* or (ii) of a temporary nature, caused by a toxin, drug, or disease." This implies those acute brain syndromes resulting from poison, systemic infection, *exhaustion, or malnutrition*. It must be borne in mind that this does not conflict with the requirement that a class A certificate shall be issued for narcotic drug addiction or for excludable mental disorders existing in the case of addiction to other drugs.

\*  \*  \*  \*  \*  \*  \*

10. *Mental defect*.—a. Under this term is classified any mental disease not discussed above which when it seriously impairs the mental function of the alien and gravely interfers with his total behavior and interpersonal relations is to be regarded as excludable. \* \* \*

b. The determination of the existence of a *serious* degree of mental abnormality must be left to the examining physician, but several criteria are given below as an aid to him in exercising his professional judgment: (1) whether the mental defect is of an hereditary nature; (2) whether it would require hospitalization; (3) whether the individual's behavior resulting from the defect is such as to be likely to bring him into repeated conflict with social customs, constituted authority, or the social environment.

\*  \*  \*  \*  \*  \*  \*

e. Individuals suffering from psychoneurosis are certifiable for mental defect only upon determination of a serious degree of mental illness in accordance with the criteria outlined above. (Emphasis supplied throughout.)

In addition to the above directions, Section B of the Manual, Types of Certificates in Various Diagnostic Categories, page 6–15, lists "Transient Situational Personality Disorders, gross stress reaction," with the symbol "K," for which the directions are, "Do not certify." It seems clear that the regulations adequately cover the instant case, and that they do not contemplate that a person such as respondent should be deported on the charge laid here.

Respondent's brief on appeal cites four cases, all unreported, in each of which the Board found that the Immigration Service had not met the burden of establishing that the mental illness existed at time of entry. In a number of cases, unreported, the Board has invoked 42 CFR 34.7 and found that temporary conditions (*e.g.*, injuries, post-partem psychoses, illnesses due to surgery and glandular conditions, *etc.*) do not constitute insanity or mental defects for immigration purposes. The only reported Board decisions on this subject are *Matter of W——*, 2 I. & N. Dec. 68; *Matter of S——*, 5 I. & N. Dec. 682, similar to the instant proceeding; and *Matter of V——*, 2 I. & N. Dec. 127, where the order of exclusion was affirmed.

In the instant case, we have conflicting evidence and medical diagnoses as to whether respondent was afflicted with a mental defect at the time of his last entry. Since the question arises in deportation, as distinguished from exclusion proceedings, the Board is required to evaluate all the evidence of record, including the certificates of the United States Public Health Serivce and the

evidence submitted by respondent, in order to determine whether the charge is sustained. *United States ex rel. Johnson* v. *Shaughnessy*, 336 U.S. 806 (1949) ; *United States ex rel. Leon* v. *Murff*, 250 F.2d 436 (C.A. 2, 1957).

Although there is nothing in the record one way or the other, we must assume that respondent was thoroughly examined in Italy, both mentally and physically, before he was issued an immigration visa for entry into the United States for permanent residence. The only evidence of mental illness prior to respondent's entry into the United States is the less than 2 months in the hospital in Rome, where his diagnosis on admission was "schizophrenic syndrome," and there was no further diagnosis at the time of dismissal. In addition, we have the two certifications of the United States Public Health Service, exhibits 3 and 13, based, not on personal examination of the alien, but on other documents (of record here) submitted for their opinion, and a clinical summary and certification as to alien's becoming a public charge from the Brooklyn State Hospital, Brooklyn, New York, both documents created at the time of his second illness. On the other hand, the alien has offered medical testimony of two psychiatrists who examined him personally, one in 1950 before the second period of illness, and the other who has seen him recently and over a period of the last several years. Both agree that he is not schizophrenic, that he did not have schizophrenia, that his illness were akin to war neurosis, brought on not only by his war experiences, but by his efforts to adjust while still in his "teens," alone and unaided, to life in two foreign countries, Italy and the United States, in rapid succession, neither of whose languages he knew.

So far as this record shows, the alien has made a successful adjustment to life in the United States, having obtained two college degrees within the past 9 years while he was learning the English language. He is married, and has been and is self-supporting. A large body of psychiatric writing indicates that if respondent had been suffering from schizophrenia he could not, following brief periods of hospitalization and treatment, have again emerged into a new and highly competitive society and fended for himself under the most strenuous conditions.

It seems reasonable enough from the medical testimony offered by respondent, and confirmed by other authorities available to us, and even more so by respondent's performance during the past 9 years, that his was a temporary disability due to exhaustion and malnutrition, and was a transient stress reaction to the difficult circumstances of the previous 10 years and the immediate situation in which he found himself at the time. His illness was not a mental defect of an hereditary nature; it has not brought him into "repeated conflict

with social customs, constituted authority, or the social environment; and there is even some question that he could be said to have "required hospitalization." Diagnosis as to the course of respondent's illness would have been difficult in 1951, as paragraph 4e of the Manual for Medical Examination of Aliens (Chapter 6, Section 4, p. 6–4) points out, but it is easy enough now to say that it was due to remediable physical causes, and this is our conclusion.

The Immigration Service has not sustained the burden of proving that respondent was excludable at the time of his entry as a person afflicted with a mental defect, to wit: schizophrenia. The proceedings will be terminated.

**Order:** It is ordered that the proceedings be and are hereby terminated.